UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KIMBERLY RATLIFF,<br><br>Plaintiff,<br><br>v.<br><br>INDIANA STATE POLICE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:25-cv-00111-KMB-RLY |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Kimberly Ratliff filed this lawsuit against her former employer, Defendant Indiana State Police ("ISP"). ISP terminated Ms. Ratliff's employment after less than three weeks on the job. Ms. Ratliff alleges that she has a qualifying disability—narcolepsy—and that ISP's failure to accommodate her disability and its decision to terminate her because of her disability and in retaliation for seeking an accommodation for her disability violated the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* ("Rehabilitation Act"). [Dkt. 1-3 at 9.]

Presently pending before the Court is ISP's Motion for Partial Summary Judgment. ISP seeks summary judgment on all of Ms. Ratliff's claims except her failure-to-accommodate claim brought under the Rehabilitation Act. For the reasons explained below, ISP's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. [Dkt. 61.]

## I. APPLICABLE STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact, and instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P 56(a). On summary judgment, a party must show what

evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "Summary judgment is not a time to be coy." *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)). Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The trial court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the

suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Factual disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. RELEVANT BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Ms. Ratliff as the nonmoving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Ms. Ratliff's Narcolepsy

Ms. Ratliff was diagnosed with type 2 primary narcolepsy in late 2005 or early 2006. [Dkt. 62-1 at 23.] Narcolepsy causes the brain to "struggle[] to commit to wakefulness or . . . sleepiness." [Dkt. 62-16 at 29-30.] Symptoms of narcolepsy include uncontrolled tiredness, tactile hallucinations, and sleep paralysis. [Dkt. 62-16 at 31, 34-35.] Ms. Ratliff explained that her narcolepsy also causes her to experience "microsleep," which she described as "zon[ing] out" or "los[ing] time" where time passes but she is not aware of how it passed. [Dkt. 62-1 at 208.] She is also "tired all the time" and can have difficulty with concentration, alertness, and social interactions. [*Id.* at 210.]

### B. Ms. Ratliff is Hired by ISP

In early 2024, Ms. Ratliff was hired as a paralegal for ISP in its fiscal section, with her first day on April 1, 2024. [Dkt. 66-1.] Ms. Ratliff's office hours were 8:00 a.m. to 4:30 p.m. [Dkt. 62-12 at 38.] New paralegals at ISP are subject to a twelve-month probationary period. [Dkt. 62-

4 at 1; dkt. 62-2 at 20.] During the probationary period, such employees are monitored by supervisors to ensure they are meeting performance requirements, and they are not entitled to the same appeal rights as non-probationary employees. [Dkt. 62-2 at 21.]

Ms. Ratliff's direct supervisor was Tina LaShure, who was the assistant director of ISP's fiscal section. [Dkt. 62-11 at 4.] Ms. LaShure's supervisor was Mickey James, the Chief Financial Officer for ISP. [*Id.* at 13.]

During Ms. Ratliff's employment, Lieutenant Williams was the Human Resources and Employment Services Commander in the human resources division, and Major Charles Sorrells was the Assistant Chief of Staff of Human Resources. [Dkt. 62-2 at 17-18, 55-56.] Pam Douglas was the Human Resources Director. [Dkt. 62-11 at 3.] Douglas Carter was at all relevant times ISP's Superintendent, and he had ultimate hiring and firing authority for ISP. [Dkt. 62-2 at 56-57; dkt. 62-11 at 11.]

**C. Ms. Ratliff Arrives Late to Work on Multiple Occasions**

During Ms. Ratliff's second week of work, one of her coworkers remarked to Ms. LaShure that "it would be nice to come in late every day," referring to Ms. Ratliff. [Dkt. 62-12 at 42.] That same week, Ms. LaShure gave Ms. Ratliff her cell phone number. [Dkt. 62-1 at 182-83.] Ms. Ratliff thanked Ms. LaShure because she "didn't know who to call and what to do if [she] was having problems with getting into work." [*Id.* at 183.]

Once Ms. Ratliff's tardiness was brought to Ms. LaShure's attention, she mentioned it to her supervisor, Ms. James, around Friday, April 12, 2024. [*Id.* at 43.] Ms. James responded, "okay," and instructed Ms. LaShure to start tracking Ms. Ratliff's attendance. [*Id.*] Otherwise, Ms. James did not discuss the possibility of disciplining Ms. Ratliff. [*Id.* at 57.] Ms. James "just

mentioned talking to [Ms. Ratliff]," telling her to "sign in," and "recommended her leaving earlier in the morning." [*Id.* at 57-58.]

Beginning on Friday, April 12, Ms. Ratliff was late to work at least three workdays in a row, and she texted with Ms. LaShure about her arrival time each morning. On April 12, Ms. Ratliff texted Ms. LaShure at 7:59 a.m., stating that she had tried a new route to work and had "gotten turned around a bit" but was "back on track" and near work. [Dkt. 62-1 at 183; dkt. 62-7 at 1.] Ms. LaShure responded, "Okay, thanks." [*Id.*] On Monday, April 15, Ms. Ratliff texted Ms. LaShure at 8:02 a.m. that she was "[s]topped by a train" and "[w]aiting for back up to clear out." [Dkt. 62-7 at 1.] Ms. LaShure responded, "Okay, be careful and see you soon." On Tuesday, April 16, Ms. Ratliff texted Ms. LaShure, "Sorry to sound like a broken record. There must have been an accident along my route…it's taken me more than 10 minutes to move 3 blocks." [*Id.* at 2.] Ms. LaShure responded, "Okay, be careful and see you soon." [*Id.*]

### D. Ms. Ratliff First Raises her Disability and an Accommodation with Ms. LaShure

Later on April 16, Ms. Ratliff and Ms. LaShure exchanged messages at work via Microsoft Teams. Ms. LaShure sent Ms. Ratliff the following message: "Yes, you may make up your time at the end of the day. I do not see where you signed out of teams attendance yesterday . . . did you forget? Please sign out of teams attendance when you leave for the day, Maybe you need to leave earlier in the morning? Thank you." [Dkt. 62-6.] Ms. Ratliff responded as follows:

> Yes! I did forget to sign out of teams last night. My apologies for neglecting to do what you instructed. I wrote down in my calendar that I left at 5:11pm. I believe I mentioned before that I do not have a concept of time. In my previous jobs, I have been granted an ADA accommodation providing me a flexible start time (along with a few other requests) due to my disability. I have not made an official request yet, but it is clear I am struggling with the earlier start time. I do not recall reading any outlined procedures in the policy acknowledgments I signed. I intended to research State Personnel to see if there were any instructions on how to make an ADA request.

[Dkt. 62-5.]

After Ms. LaShure's comment that perhaps Ms. Ratliff needed to leave earlier for work, Ms. Ratliff realized that Ms. LaShure "didn't have a concept of what [her] struggles were and that leaving earlier in the morning was not going to be a feasible solution to [her] problem" because she "can't control when [she] ha[s] a microsleep," and she has to do what she "can to make certain that I am safe to get in the car and to be on the roadway." [Dkt. 62-1 at 206.] Later that day, Ms. LaShure sent Ms. James a screenshot of the Teams messages noted above, including Ms. Ratliff's message regarding her disability and ADA accommodations. [Dkt. 66-9 at 2.] Ms. James responded that they should involve Ms. Miller-Cronk in human resources. [*Id.*]

**E. Ms. Ratliff Continues to Arrive Late to Work**

On Wednesday, April 17 at 8:20 a.m., Ms. LaShure observed Ms. Ratliff arriving late to work even though Ms. Ratliff had not notified her that she was running late. [Dkt. 66-9 at 2.] Ms. LaShure then had a closed-door meeting with Human Resources Director Pam Douglas regarding Ms. Ratliff. [*Id.*] Because Ms. Ratliff had "mention[ed] ADA accommodations," Ms. Douglas recommended that Ms. LaShure discuss the issue with Ms. Miller-Cronk. [*Id.*]

Later that day, Ms. LaShure had not received any communication from Ms. Ratliff about arriving late that morning, so Ms. LaShure discussed Ms. Ratliff's tardiness with Ms. James. [*Id.*] Ms. James requested that Ms. LaShure send Ms. Ratliff an email regarding her late arrival and the failure to notify Ms. LaShure of it. [*Id.*] Ms. LaShure had drafted the email and was on the phone with Ms. James when, at 1:58 p.m., she received Ms. Ratliff's email requesting an ADA accommodation. [*Id.*]

**F. Ms. Ratliff's Email Request for Accommodation**

Ms. Ratliff's email requesting an ADA accommodation was sent to Lieutenant Williams in human resources and copied Ms. LaShure. [Dkt. 66-8 at 2.] It read as follows:

> Good afternoon Lt. Williams,
>
> Despite my efforts, I have not been successful with arriving to [work] by 8am. While I have no doubt of my ability to fulfill the essential job duties of this position, it is necessary for me to request accommodations as outlined in the attached memo.
>
> I understand this request will initiate a process that may require documentation from my neurologist.
>
> Please let me know if I should direct my request elsewhere.
>
> Thank you,
>
> Kimberly Ratliff

[*Id.*] The memo attached to the email outlined Ms. Ratliff's requested ADA accommodations for her narcolepsy. The introduction to the memo stated:

> Based upon the challenges I have experienced with arriving at the office by 8AM, I believe it is now necessary for me to request an ADA accommodation due to my medical diagnosis of narcolepsy, a chronic neurological disorder causing dysregulation of my sleep/wake cycle. Below is a list of requested accommodations that will assist with the management of my symptoms.

[Dkt. 62-8 at 2.] Among other things, Ms. Ratliff requested as an accommodation to be "permitted a flexible work schedule to ensure I can safely travel to and from work." [*Id.*]

**G. Ms. LaShure Circulates Ms. Ratliff's ADA Accommodation Request**

Two minutes after receiving Ms. Ratliff's ADA accommodation request email, Ms. LaShure—per Ms. James's request over the phone, [dkt. 62-12 at 110]—forwarded Ms. Ratliff's request to Ms. James and copied Ms. Miller-Cronk, [dkt. 62-14 at 1]. Ms. James then forwarded the email to Mr. Sorrells in human resources, and Colonel Mark French, ISP Superintendent's Assistant and Ms. James's direct supervisor, [dkt. 62-12 at 111], stating: "Please see the attached.

[Ms. Ratliff] has worked for ISP for a total of 12 days. [Ms. LaShure] has noticed that she has been tardy 4 out of the last 4 days she has reported to work." [*Id.*]

Later that afternoon, Ms. Miller-Cronk responded to Ms. LaShure and Ms. James, letting them know that she received Ms. Ratliff's request for accommodation and that she "will be consulting with Attorney Cynthia Forbes and will be back in touch." [Dkt. 66-8 at 1.] Ms. Miller-Cronk forwarded Ms. Ratliff's request to Ms. Forbes around that same time. [Dkt. 66-6 at 1.]

### H. Ms. LaShure Circulates Documentation Regarding Ms. Ratliff's Tardiness

Within an hour after circulating Ms. Ratliff's ADA accommodation request, Ms. LaShure sent Ms. James an email with the subject "Kimberly Ratliff Timeline." [Dkt. 66-7 at 1.] The email read: "As requested, please see timeline via text message, teams chat, and email below," and noted Ms. Ratliff's hire date was April 1, 2024. [*Id.*] The email included communications between Ms. Ratliff and Ms. LaShure via text message and Teams regarding Ms. Ratliff's tardiness on April 12 and April 15-17. [*Id.* at 1-10.]

One hour later, Ms. James forwarded the email to Mr. Sorrells. [Dkt. 66-7 at 1.] The email to Mr. Sorrells read as follows:

> Attached and in the body of this email are various forms of correspondence between Tina LaShure and Kimberly Ratliff documenting Kimberly's tardiness over the past few days. She has been consistently late for work. This documentation represents 4 known days out of the total 12 days she has been employed with ISP. Please let me know if you have any questions or concerns with the information provided.

[*Id.*]

At the end of the workday, Ms. James again forwarded the email to Mr. Sorrells, but this time also included her direct supervisor, ISP's Superintendent's Assistant Colonel French, [dkt. 62-14 at 1]. Ms. James's email read as follows: "Please see the attached. [Ms. Ratliff] has worked for

ISP for a total of 12 days. [Ms. LaShure] has noticed that she has been tardy 4 out of the last 4 days she has reported to work." [Dkt. 62-14 at 1.]

### I. ISP Terminates Ms. Ratliff's Employment

The next day, Ms. LaShure drafted an interoffice memorandum to Ms. James with a more detailed timeline of Ms. Ratliff's tardiness.[1] [Dkt. 66-9 at 1-2.] Ms. LaShure explained that her email timeline from April 17 "evidently . . . wasn't good enough," so she "was asked to put it in a memo in words." [Dkt. 62-12 at 116.]

That same day, a termination of employment letter was prepared and signed by ISP Superintendent Douglas Carter. [Dkt. 62-9.] In relevant part, the letter read:

> I have reviewed the supervisory documentation surrounding your probationary training period. I am also informed you have been apprised of the expectations of your position, which has been followed by continued tardiness and failure to follow supervisory direction.
>
> My conclusion is your employment in probationary status has been unsatisfactory. Therefore, pursuant to my authority as Superintendent, you are hereby discharged from the Indiana State Police Department effective immediately.

[*Id.*]

The morning of April 19, 2024, Ms. James told Ms. LaShure that Ms. Ratliff's employment would be terminated that day, that Mr. Sorrells was going to give Ms. Ratliff the termination letter, and asked Ms. LaShure to be in the meeting when Mr. Sorrells did so. [Dkt. 62-12 at 53.] Ms. James told Ms. LaShure that Ms. Ratliff's employment was being terminated due to her attendance issues. [*Id.* at 54.]

---

[1] Ms. Ratliff texted Ms. LaShure that she was late on the mornings of April 18 and April 19 as well, texting her each morning that she should be in the parking garage by 8:10 and 8:05, respectively. [Dkt. 62-7 at 2.] On both occasions, Ms. LaShure responded, "Okay thank you. Let me know when you are in your office." [*Id.*]

That afternoon, Ms. LaShure and Mr. Sorrells met with Ms. Ratliff, and Mr. Sorrells read the termination memorandum to Ms. Ratliff. [Dkt. 62-1 at 230-31.] Ms. Ratliff was "in shock." [*Id.* at 229.] She said, "what about the interactive process?" and Mr. Sorrells responded, "[w]e have standards." [*Id.*] Ms. Ratliff replied that she "has a disability" and that she "asked for an accommodation for being late because of the struggles that I have," and Mr. Sorrells continued to repeat that they have workplace standards. [*Id.* at 229, 235.] Ms. Ratliff also asked whether Superintendent Carter knew that she "made a formal ADA request," and Mr. Sorrells responded, "[w]e're all aware." [*Id.* at 236.] Ultimately, Ms. Ratliff's employment with ISP was terminated without anyone responding to or in any way addressing her request for a reasonable accommodation.

## III. DISCUSSION

Ms. Ratliff originally filed her claims under the ADA and Rehabilitation Act in state court. [Dkt. 1-4 at 1-6.] Specifically, she brought claims of failure to accommodate, disability discrimination, and retaliation under both statutes. [*Id.* at 5.] ISP removed this case from state to federal court on January 17, 2025. [Dkt. 1.]

ISP does not move for summary judgment on Ms. Ratliff's reasonable accommodation claim under the Rehabilitation Act. However, ISP seeks summary judgment as to all of Ms. Ratliff's ADA claims as well as her discrimination and retaliation claims under the Rehabilitation Act. Because the arguments regarding the ADA and Rehabilitation Act claims are distinct, the Court will address them each in turn.

### A. ADA Claims and Sovereign Immunity

ISP argues that, as an agency of the State of Indiana, the Eleventh Amendment gives it sovereign immunity from private damages claims like the ADA claims brought by Ms. Ratliff in

this case. [Dkt. 63 at 11-12.] Ms. Ratliff responds that ISP waived its sovereign immunity by removing this case from state to federal court. [Dkt. 67 at 25-26.] In reply, ISP acknowledges that the Seventh Circuit Court of Appeals has at times stated that sovereign immunity "may be waived if a defendant removes a case to federal court or consents to removal of a case." [Dkt. 70 at 2.] But it argues that it is an unsettled question in the Seventh Circuit as to whether removal by a State waives only immunity from suit in federal court, or whether removal also waives immunity from liability. [*Id.* at 2-3.] ISP urges the Court to take the former position and conclude that it is entitled to immunity from liability even though removal waived its immunity from suit in federal court. [*Id.* at 3-5.]

The United States Supreme Court in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), held that money damages against States for violations of Title I of the ADA are barred by Eleventh Amendment sovereign immunity. *Id.* at 374. The Supreme Court has also held that, while the Eleventh Amendment "grants a State immunity from suit in federal court . . . [,] the State's act of removing a lawsuit from state court to federal court waives this immunity." *Lapides v. Bd. Of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 616 (2002).

The Seventh Circuit Court of Appeals has explicitly interpreted *Lapides* to state a "general rule" that a State's litigation conduct—including removal from state to federal court—can constitute a waiver of sovereign immunity. *Board of Regens of Univ. of Wis. Sys. v. Phoenix Intern. Software, Inc.*, 653 F.3d 448, 461-62 (7th Cir. 2011). As the Parties recognize in their briefing, the Seventh Circuit has continued to cite this principle. *See St. Augustine School v. Underly*, 78 F.4th 349, 360 (7th Cir. 2023) ("[The defendant] attempts to invoke sovereign immunity, but her sovereign immunity defense was waived when she voluntarily joined in the removal to federal court."); *McHugh v. Ill. Dept. of Transp.*, 55 F.4th 529, 533 (7th Cir. 2022) ("[A] state may waive

its sovereign immunity by, for example, consenting to the removal of a case from state to federal court.").

The Parties also recognize, however, that the Seventh Circuit Court of Appeals has explicitly recognized that *Lapides* and its decision in *Phoenix International Software* left several questions unsettled. *See Hester v. Ind. State Dep't of Health*, 726 F.3d 942, 949 (7th Cir. 2013). Specifically, the Seventh Circuit has recognized that Eleventh Amendment immunity "encompasses both immunity from liability as well as immunity from suit." *Nanda v. Bd. Of Trustees of Univ. Ill.*, 303 F.3d 817, 821 (7th Cir. 2002). But the Seventh Circuit noted in *Hester* that it is an open question as to whether a State's removal of a case to federal court waives only its immunity from suit in federal court or also waives its immunity from damages liability. *Hester*, 726 F.3d at 950-51. After outlining the positions other circuits have taken on the issue, *id.*, the Seventh Circuit noted that these cases raise the question of whether it is "correct to distinguish between immunity from suit and immunity from a forum?" *Id.* at 950. Ultimately, the Seventh Circuit left this and other questions unresolved. *Id.* at 951 ("Rather than plunge into those delicate topics in a case where the answers ultimately do not matter, we are content to save them for another day.").

The Parties agree that the Seventh Circuit has not yet resolved this issue of whether a State's removal of a case to federal court also waives the State's ability to invoke sovereign immunity on certain claims. [Dkt. 67 at 26; dkt. 70 at 2-4.] As noted above, Ms. Ratliff urges the Court to not distinguish between immunity from suit and immunity from a forum and hold that ISP has waived all sovereign immunity by removing the case to federal court, while ISP asks the Court to hold that its removal only waived immunity from suit in a federal forum.

In the end, the Court agrees with ISP that its position is more consistent with *Lapides* and the other courts who have held that removal does not waive immunity defenses that would have otherwise been available. Notably, the District Court's decision in *Hester* held that removal waives immunity from suit in a federal forum but does not waive immunity from liability. *See Hester v. Ind. State Dep't of Health*, 2012 WL 3779218, *3-5 (S.D. Ind. Aug. 30, 2012). To reach this conclusion, *Hester* first recognized that "there is a distinction between immunity from suit in federal court and immunity from liability." *Id.* at *4 (citing *Lombardo v. Pennsylvania Dep't of Public Welfare,* 540 F.3d 190, 198 (3d Cir. 2008)). It then agreed with the reasoning of the courts that "have held that, while removal does constitute waiver of the Eleventh Amendment right of a state to be free from suit in federal court, removal does not operate to waive any defenses to liability—immunity included—which the state could assert no matter where the lawsuit was pending." *Id.* (citing, *e.g.*, *Lombardo*, 540 F.3d at 198).

The undersigned agrees with the reasoning of the decisions cited above. As recognized by the District Court and the Seventh Circuit Court of Appeals in *Hester*, multiple courts read *Lapides* "as holding that, by removing to federal court, a state waives only its immunity from the jurisdiction of the federal forum, but it retains immunity as a defense to liability to the extent the defense would be available in state court." *Hester*, 726 F.3d at 949 (citing *Stroud v. McIntosh*, 722 F.3d 1294, 2013 WL 3790961 (11th Cir. July 23, 2013); *Lombardo*, 540 F.3d at 198; *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 255 (5th Cir. 2005)). Those courts "have reached the same result by slightly different reasoning," holding that "waiver-by-removal occurs only if, as in *Lapides*, the removing state stands to gain an unfair advantage by asserting immunity that it would not have enjoyed in its state courts." *Hester*, 726 F.3d at 949 (citing *Bergemann v. R.I. Dep't of Envtl. Mgmt.*, 665 F.3d 336, 342 (1st Cir. 2011); *Stewart v. North Carolina*, 393 F.3d 484, 490 (4th

Cir. 2005)). The undersigned views that conclusion as more consistent with *Lapides* than Ms. Ratliff's position. This is because the Supreme Court's reasoning in *Lapides* substantially rested on ensuring that States could not use removal to create unfair advantages in litigation. *See Lapides*, 535 U.S. at 622. Unfairness concerns are not present when removal by a State does not allow it to raise a defense in federal court that it would not have been able to raise in state court; thus, removal should not act as a waiver of those defenses. *See, e.g.*, *Bergemann*, 665 F.3d at 342 ("Rhode Island's sovereign immunity defense is equally as robust in both the state and federal court. Consequently, there is nothing unfair about allowing the state to raise its immunity defense in the federal court after having removed the action. Simply put, removal did not change the level of the playing field.").

As ISP points out, [dkt. 70 at 4], it would have been able to raise sovereign immunity—that is, immunity from liability—in state court just as it attempts to do so here in response to Ms. Ratliff's ADA claims. *See Marion Cnty. Court v. King*, 150 N.E.3d 666, 676 (Ind. Ct. App. 2020) (recognizing sovereign immunity as a defense to ADA claims in state court). As such, ISP did not gain any unfair advantage by removing this case to federal court. Accordingly, the Court agrees with the District Court in *Hester* and the other courts cited above that have concluded that removal in these circumstances does not waive the State's defense of immunity from liability. Because that defense was not waived, and sovereign immunity bars money damages against States or their agencies for violations of Title I of the ADA, *Garrett*, 531 U.S. at 374, the Court concludes that ISP is entitled to summary judgment on Ms. Ratliff's ADA claims.

**B. Rehabilitation Act Claims**

ISP does not argue that sovereign immunity precludes Ms. Ratliff's discrimination and retaliation claims under the Rehabilitation Act. However, ISP maintains that it is entitled to

summary judgment on those claims brought under the Rehabilitation Act. Because the two claims and the Parties' arguments about them significantly overlap, the Court will address both together. The Court begins by setting forth the legal standards governing Ms. Ratliff's claims, then it will summarize the Parties' arguments regarding them, and it ultimately concludes that fact issues preclude summary judgment in favor of ISP on both claims.

The Rehabilitation Act "'prohibit[s] an employer from discriminating against a qualified individual with a disability because of the disability.'" *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005) (quoting *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999)). "To prove a claim of disability discrimination under the Rehabilitation Act, a plaintiff must show that: (1) [s]he is disabled, (2) [s]he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) [s]he suffered an adverse job action solely by reason of . . . [her] disability." *Swain v. Wormuth*, 41 F.4th 892, 899 (7th Cir. 2022). Notably, the causation showing under the Rehabilitation Act is higher than that in the ADA context, requiring "sole causation, rather than but-for causation." *Lewis v. Ind. Dep't of Transp.*, 173 F.4th 876, 882 (7th Cir. 2026).

The Rehabilitation Act also "prohibit[s] retaliation for the exercise of rights conferred by th[e] statute." *E.W. v. Mt. Vernon Cmty. Sch. Corp.*, 191 F.4th 540, 548 (7th Cir. 2026). To prove such a retaliation claim, the plaintiff "must show: (1) she engaged in a statutorily protected activity;

(2) she suffered an adverse action by her employer; and (3) there is a causal link between the two." *Lewis*, 173 F.4th at 884.[2]

For the purposes of summary judgment, ISP does not dispute that Ms. Ratliff's narcolepsy qualifies her as disabled under the Rehabilitation Act. [Dkt. 63 at 14.] But ISP argues that the undisputed facts show that Ms. Ratliff cannot meet the second element of her discrimination claim or show causation for either claim. [*Id.*] Specifically, ISP argues that the undisputed evidence shows that Ms. Ratliff's tardiness "caused her to not be qualified for the position," and that her tardiness was also the reason for her termination, not her disability. [*Id.*] As to the causation element, ISP acknowledges the close temporal proximity between Ms. Ratliff's notification of her disability and request for accommodation and her termination, but it argues that any inference that can be drawn is rebutted by an alternative, legitimate reason given for her termination—specifically, her repeated tardiness. [*Id.* at 18-19.]

Ms. Ratliff responds that there are genuine issues of material fact that preclude summary judgment in ISP's favor. Ms. Ratliff frames two key factual disputes that preclude summary judgment—namely, that "[t]imeliness was not an essential function of her position" and that ISP "terminated [her] employment because of her narcolepsy, or in retaliation for her request for disability accommodations." [Dkt. 67 at 15.] Ms. Ratliff argues that a reasonable jury could conclude that ISP terminated her employment because of her narcolepsy and her request for an accommodation, and that ISP's reliance on her tardiness is pretext since the tardiness only became

---

[2] The Seventh Circuit Court of Appeals has recognized that its "precedent is inconsistent as to whether a plaintiff must show the protected activity was the but-for cause of the adverse action, or whether it is enough to show retaliatory intent played a part in the termination." *Lewis*, 173 F.4th at 884 (citations, quotation marks, and alterations omitted). The Court need not decide which standard to apply here, as there are genuine issues of material fact regarding retaliation under either standard.

a disciplinary matter once she disclosed her narcolepsy and asked for an accommodation. [*Id.* at 17-18.] She maintains that the one-day gap between her request for an accommodation and ISP's decision to terminate her employment is alone enough for a reasonable jury to infer that the request was the cause of her termination. [*Id.* at 19.] Ms. Ratliff maintains that there is sufficient evidence to show that ISP's justification was pretextual since, prior to her request for an accommodation, Ms. LaShure's and Ms. James's response to her tardiness "was lax" and "excused" the tardiness. Notably, Ms. Ratliff points out that she was never reprimanded, never disciplined, and never informed of any potential consequences for tardiness, but was instead merely encouraged to leave earlier for work. [*Id.* at 20-22.]

In reply, ISP reiterates that the undisputed evidence shows that timeliness was an essential function of Ms. Ratliff's position. [Dkt. 70 at 6-9.] ISP contends that Ms. Ratliff ignores the other reason she was terminated—namely, her failure to properly sign-in and sign-out using Teams attendance. [*Id.* at 9.] ISP acknowledges that causation can be inferred from temporal proximity alone, but it contends that it should not be here because any such inference "is defeated by the existence of an alternative, legitimate reason for the termination." [*Id.* at 10-11.]

The Court's analysis begins with the second element of Ms. Ratliff's discrimination claim before turning to the causation element for both of her claims. The second element of the discrimination claim requires Ms. Ratliff to show that "[s]he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation." *Swain*, 41 F.4th at 899. The Parties' dispute focuses on whether timeliness was an essential function of Ms. Ratliff's position, and both Parties cite evidence in the record pointing in both directions. That alone confirms there is a genuine dispute of material fact regarding this element that the Court need not belabor.

ISP's argument regarding the second element fails for a more fundamental reason. The second element requires the employee to show that she is qualified to perform the essential functions of the job "*with or without reasonable accommodation*." *Swain*, 41 F.4th at 899 (emphasis added). Ms. Ratliff explicitly asked for an accommodation for her 8:00 a.m. start time, which included a request for "a flexible work schedule" and "authorization to arrive [at work] as late as 9AM." [Dkt. 62-8 at 2.] As detailed above, no one at ISP ever responded to her request for accommodation—let alone engaged in the mandated interactive process, the purpose of which is "identifying a reasonable accommodation," *Sansone v. Brennan*, 917 F.3d 975, 979-80 (7th Cir. 2019)—before ISP terminated Ms. Ratliff's employment.[3] There is ample evidence that such an accommodation would have allowed Ms. Ratliff to avoid further tardiness, especially considering she was consistently arriving to work no later than thirty minutes past her designated start time, and her supervisor routinely permitted her to make up for those minutes at the end of the day. Thus, even if timeliness was an essential function of Ms. Ratliff's position, the record includes evidence that, viewed in the light most favorable to Ms. Ratliff, shows she could perform this essential function with a reasonable accommodation.[4] For this additional reason, ISP's arguments regarding the second element are unavailing.

---

[3] Notably, ISP did not move for summary judgment on Ms. Ratliff's reasonable-accommodation claim; thus, it does not present any argument regarding whether Ms. Ratliff's requested accommodations were reasonable.

[4] The cases on which ISP relies do not suggest a different result. For example, ISP's reliance on *Guzman* is misplaced. [Dkt. 63 at 14-17.] There, the employee was terminated "based on her repeated failures to show up to work on time," but the Seventh Circuit held that the plaintiff in that case could not establish a claim for disability discrimination or retaliation because she could not show causation. *Guzman*, 884 F.3d at 641-43. As ISP points out, the Seventh Circuit stated that the employee's tardiness may have been caused by her disability, but "'[v]iolation of a workplace rule, even if it is caused by a disability, is no defense to discipline up to and including termination.'" *Id.* at 642 (quoting *Budde*, 597 F.3d at 863). Critical to the Seventh Circuit's holding, however, was the fact that the employee presented no evidence that the person who decided to terminate her employment knew of her disability or her asserted need for accommodation "prior to deciding to

The Court turns next to the third element, which is causation. The Court ultimately concludes that there is sufficient evidence, taken in the light most favorable to Ms. Ratliff, to allow a reasonable jury to infer that Ms. Ratliff's disability or her request for accommodation led to ISP terminating her employment. Specifically, a jury could infer causation based on the single day that elapsed between Ms. Ratliff informing her supervisor and others that she has a disability and was seeking an accommodation and IPS's decision to terminate her employment. This inference is bolstered by the evidence that ISP's stated justification for terminating her employment—her tardiness—was pretextual.[5]

The Seventh Circuit has acknowledged that "suspicious timing will rarely be sufficient in and of itself to create a triable issue of fact." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (citation and quotation marks omitted). However, "[t]he closer two events are, the more likely that the first caused the second." *Id.* Thus, "[w]hen a plaintiff relies solely on a suspicious timing argument . . . the time period between the protected activity and the adverse action must be

fire her." *Id.* at 641, 643. Without knowledge of the disability or need for an accommodation, those issues could not be the reason the decisionmaker decided to terminate the employee. In the case at bar, however, as discussed further below, there is evidence that all of the relevant decisionmakers at ISP were aware of Ms. Ratliff's disability and request for an accommodation. Critically, ISP does not contend otherwise.

[5] In ISP's reply, it argues that Ms. Ratliff's "focus on timeliness ignores the other reason her employment was terminated: her failure to use Teams attendance." [Dkt. 70 at 9.] Although ISP is correct that this other basis for termination was—at least arguably—referenced in Ms. Ratliff's termination letter, [dkt. 62-9], and mentioned in factual background section of its opening brief, [dkt. 63 at 6], nowhere in ISP's opening brief does it argue that her failure to properly use Teams attendance was the basis for her termination. ISP focuses solely on Ms. Ratliff's untimeliness as the nondiscriminatory reason for her termination. [*See* dkt. 63 at 14, 16, 18.] Thus, instead of faulting Ms. Ratliff for ignoring this in her response, the Court deems this argument waived, since ISP developed it for the first time in its reply. *See Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019) ("[A]rguments raised for the first time in a reply brief are waived."). Even if the argument was not waived, the Court would find that a genuine issue of material fact exists for the same reasons explained with respect to the other basis ISP points to for termination of Ms. Ratliff's employment.

very close—typically a period of days, not weeks or months." *Kingman v. Frederickson*, 40 F.4th 597, 603 (7th Cir. 2002) (citation and quotation marks omitted). Given this, the Seventh Circuit has had "little trouble concluding that a jury could infer causation when merely one day passes between the protected activity and the adverse employment action." *Xiong v. Bd. of Regents of Univ. of Wis. Sys.*, 62 F.4th 350, 355 (7th Cir. 2023).

Here, Ms. Ratliff first raised that she may need an accommodation for her disability to Ms. LaShure via a Teams message on April 16, 2024. [Dkt. 62-5.] The next day, on April 17, Ms. Ratliff emailed an official request for an accommodation to Lieutenant Williams in human resources and copied Ms. LaShure. [Dkt. 66-8 at 2.] Ms. LaShure forwarded that request to her supervisor, Ms. James, and copied Ms. Miller-Cronk, [dkt. 62-14 at 1], who then forwarded it on to an attorney, Ms. Forbes, [dkt. 66-6 at 1].

The next day, ISP made the decision to terminate Ms. Ratliff's employment—one day after Ms. Ratliff formally informed ISP of her disability and made her accommodation request, and two days after she first mentioned the need for an accommodation to her immediate supervisor. The Seventh Circuit has made clear that "[s]uch a compact timeline suffices as one of the instances where the timing is tight enough to support an inference of causation." *Xiong*, 62 F.4th at 355. The Court acknowledges that Rehabilitation Act claims require the plaintiff to show "sole causation, rather than but-for causation." *Lewis*, 173 F.4th at 882. But based on temporal proximity alone, the Court finds that a reasonable jury could conclude that Ms. Ratliff's disability and/or her accommodation request were the sole cause of ISP's decision to terminate her.

Even if temporal proximity alone was not enough for the Court to deny ISP's summary judgment request, temporal proximity combined with Ms. Ratliff's evidence of pretext would be. To show that ISP's justification for her termination was pretextual, Ms. Ratliff must point to

evidence that its justification was "a lie" identifying "weaknesses, implausibilities, inconsistencies, or contradictions in the [ISP's] asserted reasons that a reasonable person could find it unworthy of credence." *Murphy v. Caterpillar, Inc.*, 140 F.4th 900, 914 (7th Cir. 2025) (citations and quotation marks omitted). As Ms. Ratliff points out, her tardiness was not treated as a disciplinary issue of any significance before she informed ISP that she was disabled and needed an accommodation. Ms. LaShure did not track when Ms. Ratliff arrived or notice she was late until Ms. Ratliff's second week, when a co-worker made a comment about it to Ms. LaShure. [Dkt. 62-12 at 42-43.] And Ms. LaShure's supervisor, Ms. James, merely told Ms. LaShure to track Ms. Ratliff's attendance, "talk[]" to Ms. Ratliff about her timeliness and signing in properly, and to "recommend[] [that Ms. Ratliff] leav[e] earlier in the morning." [*Id.* at 57-58.] Ms. James and Ms. LaShure did not discuss the possibility of issuing discipline for Ms. Ratliff's tardiness. [*Id.* at 57.] Moreover, on the days when Ms. Ratliff texted Ms. LaShure to say she would be late to work, Ms. Lashure's responses were nonchalant, responding "Okay, thanks," or "Okay, be careful and see you soon." [Dkt. 62-7 at 1-2.] In fact, two days before ISP decided to terminate Ms. Ratliff's employment—Ms. LaShure told Ms. Ratliff she could make up the time when she arrived late "at the end of the day" and merely suggested leaving "earlier in the morning." [Dkt. 62-6.] In response, Ms. Ratliff informed Ms. LaShure that, at a previous job, she had an ADA accommodation permitting a flexible start time and that she intended to research how to pursue such an accommodation with ISP. [Dkt. 62-5.] Ms. Ratliff made an official request for an accommodation the next day. [Dkt. 62-8.] Her accommodation request was forwarded up the supervisory chain at ISP, including to Mr. Sorrells,

who led Ms. Ratliff's terminating meeting, and Colonel French, the Superintendent's Assistant.[6] [Dkt. 62-12 at 110-11.] As noted above, ISP decided to terminate her employment the day after her accommodation request. [Dkt. 62-9.] Her termination letter cited her "continued tardiness and failure to follow supervisor direction" as the reasons for her termination. [*Id.*]

The above shows that ISP took no meaningful disciplinary action against Ms. Ratliff before she notified her supervisor and human resources that she was disabled and requested an accommodation. Her prior tardiness was met with mere acknowledgments, a request to make up the time at the end of the day, or a suggestion to leave earlier for work. Put another way, once Ms. Ratliff informed ISP that she was disabled and needed an accommodation, her tardiness was almost immediately used as a basis to terminate her employment. Given this abrupt change, and ISP's lack of engagement in the interactive process in response to Ms. Ratliff's request for a disability accommodation, the Court concludes that a reasonable jury could view ISP's asserted basis for terminating Ms. Ratliff as "unworthy of credence" and as pretext for discrimination or retaliation. *See Murphy*, 140 F.4th at 914.

In sum, based on the evidence taken in the light most favorable to Ms. Ratliff, a reasonable jury could conclude that she could establish causation for both her discrimination and retaliation claims under the Rehabilitation Act. Because Ms. Ratliff has produced sufficient evidence to preclude summary judgment as to each element of these claims, the Court must deny ISP's request for summary judgment.

---

[6] Although it is unclear who at ISP ultimately recommended or decided to terminate Ms. Ratliff's employment, for good reason, ISP does not raise any issues about whether the relevant decisionmaker was aware of Ms. Ratliff's request for accommodation. During the termination meeting, Mr. Sorrells, in response to Ms. Ratliff asking if the Superintendent knew of her "formal ADA request," responded, "[w]e're all aware." [Dkt. 62-1 at 236.]

## IV. CONCLUSION

For the reasons explained herein, ISP's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. [Dkt. 61.] ISP is **GRANTED** summary judgment on Ms. Ratliff's ADA claims but is **DENIED** summary judgment on Ms. Ratliff's discrimination and retaliation claims under the Rehabilitation Act. ISP did not move for summary judgment on Ms. Ratliff's reasonable accommodation claim under the Rehabilitation Act, so that claim remains pending as well. Ms. Ratliff's Rehabilitation Act claims will be resolved either by trial or settlement.

Counsel are **ORDERED** to meet and confer and file a joint statement **no later than November 23, 2026,** that states the Parties' preferred month for a jury trial and the number of days they estimate a trial will take. The Parties' joint report shall also state whether they would like to engage in a settlement conference with another judicial officer ahead of trial, in private mediation, or if they do not prefer either at this time.

**SO ORDERED.**

Date: 11/9/2026

Kellie M. Barr
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email